Filed 11/26/14  P. v. Richmond CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B250018 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA090579) |
| v. | |
| DARYOL RICHMOND et al., | |
| Defendants and Appellants. | |

APPEALS from judgments of the Superior Court of Los Angeles County.  Mark C. Kim, Judge.  Affirmed.

Jerome McGuire, under appointment by the Court of Appeal, for Defendant and Appellant Daryol Richmond.

Wayne C. Tobin, under appointment by the Court of Appeal, for Defendant and Appellant Michael Williams.

Kamala D. Harris, Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews, Rama R. Maline, and William Shin, Deputy Attorneys General, for Plaintiff and Respondent.

Defendants and appellants Daryol Richmond (Richmond) and Michael Williams (Williams)[1] appeal from their attempted robbery convictions. Defendants assign error as follows: Williams contends that there was no substantial evidence of his identity as one of the perpetrators of the crimes; both defendants contend that one of the victims was not shown to have been in constructive possession of the targeted property; Richmond contends that there was an insufficient foundation for two of the gang expert's opinions; both defendants contend that the gang enhancement was unsupported by substantial evidence; and Richmond contends that two witnesses gave improper opinions regarding his truthfulness. Finding no merit to defendants' contentions, we affirm the judgments.

## BACKGROUND

**Procedural history**

Defendants and Demaje Boswell (Boswell) were charged in a third amended information with the attempted second degree robbery of Norman Yueman Liu (Liu) in count 1, and Sylvestre Cardenas Martinez (Martinez) in count 2, in violation of Penal Code sections 664 and 211;[2] and in count 3 with assault with a firearm in violation of section 245, subdivision (a)(2). As to counts 1 and 2 only, the information alleged that a principal personally used a firearm within the meaning of section 12022.53, subdivisions (b) and (e)(1). The information alleged that in the commission of all the crimes charged, a principal was armed with a firearm within the meaning of section 12022, subdivision (a)(1), and that Richmond personally used a firearm within the meaning of section 12022.5, subdivision (a). It was further alleged as to all three counts that the offenses were committed for the benefit of, at the direction of, and in association with a criminal street gang with the specific intent to promote, further, and assist in criminal conduct by gang members within the meaning of section 186.22, subdivision (b)(1)(B).

---

[1]    We refer to the appellants as Richmond and Williams individually, and defendants collectively.

[2]    All further statutory references are to the Penal Code, unless otherwise indicated.

As to Richmond, the information alleged that he was out of custody on bail or on his own recognizance at the time of the commission of all three offenses, and that he had suffered one prior serious or violent felony conviction within the meaning of section 667, subdivision (a)(1), and the "Three Strikes" law (§§ 667, subds. (b)-(i), and 1170.12, subds. (a)-(d).)

Defendants and Boswell were tried jointly. The jury found each of them guilty of counts 1 and 2 and not guilty of count 3. The jury found the gang allegation true only as to Richmond and Williams, and found not true all the firearm enhancements. In a bifurcated court trial, the allegations that Richmond had suffered a prior robbery conviction and that he was out of custody on bail at the time of the offenses were found true.

On July 16, 2013, Richmond was sentenced to a total prison term of 19 years 4 months, to run consecutively to his sentence in Los Angeles Superior Court case No. BA380307. As to count 1, the court selected the high term of three years and doubled it to six years as a second strike. Richmond was sentenced in count 2 to a consecutive eight months (one-third the middle term of two years), doubled to 16 months as a second strike, plus enhancements of five years each for the gang and recidivism findings, and two years due to Richmond's bail status. Richmond was ordered to pay mandatory fines and fees, and was given 1213 days of presentence custody credit, comprised of 607 actual days and 606 days of conduct credit.

On July 17, 2013, Williams was sentenced to seven years eight months in prison, comprised of the middle term of two years, plus a gang enhancement of five years as to count 1, and a consecutive term of eight months (one-third the middle term of two years) as to count 2. Williams was ordered to pay mandatory fines and fees, and was given 1256 days of presentence custody credit, comprised of 628 actual days and 628 days of conduct credit.

Defendants filed timely notices of appeal from the judgments.[3]

**Prosecution evidence**

On October 28, 2011, Liu, the owner of a check cashing business, went to the bank to withdraw a large amount of cash. A neighboring business owner usually accompanied Liu on such occasions but was unavailable that day. Since Liu had been robbed three weeks earlier when he had gone to the bank alone, he asked another acquaintance, Martinez, to accompany him and to bring a gun for protection. Liu first drove to Martinez's house so Martinez could collect his gun, and then drove to bank where he withdrew $80,000, which he placed in a bag in his pocket.

Once back in the parking lot of Liu's place of business, Liu parked and Martinez got out of the car. Two people then emerged from another car in the parking lot and fired weapons. Martinez closed his eyes momentarily, and then returned fire with his nine-millimeter pistol. A security video of much of the incident was shown to the jury. The video showed that as Martinez began to step out of Liu's car, an African-American man wearing a black hooded sweatshirt got out of the front passenger side of another car, and ran toward Martinez. A second man came from the driver's side of the car. Narrating the video, Martinez testified that the man was holding a weapon as he ran toward Martinez, and he pointed it at Martinez's face and chest from about 25 to 30 feet away. The assailants' car then moved off down an alleyway, with one of the gunmen running alongside yelling, "Wait for me." The car struck the man who fell. The fallen man's gun either fell from his hand or was thrown by him. The man who was struck by the getaway car got up and both he and the car disappeared from view.

The same day, Los Angeles Police Department (LAPD) Officer David Azevedo brought Liu to a field show up where Liu identified Williams as one of the people involved in the assault. At trial Liu identified Williams and Richmond as the two assailants who were holding guns. Prior to trial Martinez selected Richmond's photograph from a photographic lineup, but not the photographs of Williams or Boswell.

---

[3] Boswell was also sentenced to prison and filed a notice of appeal. His appeal was subsequently abandoned and then dismissed on January 14, 2014.

4

Martinez testified at trial that he thought that the man who pointed a gun at him and was struck by the car was either Williams or Richmond, but was not certain.

Martinez identified a photograph of the getaway car, a Nissan Maxima with no license plates. Shortly after the shooting incident, the same car collided with a palm tree. Victor Chavarri, a witness who heard the collision, testified that he immediately went outside, saw one person in the car, and another person limping quickly away from the car. Chavarri got a good look at the man's face, and later selected Richmond's photograph from a photographic lineup. Police officers found Williams at the scene of the collision, wearing tan shorts and a black hooded sweatshirt. Boswell was transported to a hospital for treatment of a gunshot wound in his back. A bullet hole was observed in the driver's seat along with some blood residue. Fingerprints found in or on the Maxima matched those of Williams and Boswell.

A while later, LAPD Officers Collin Brennen and Thomas Onyshko encountered Richmond sitting in a car, apparently suffering from gunshot wounds. Richmond claimed he had been shot by a rival gang member, "Red Flag from VNG." The officers were acquainted with Richmond, knew him to be a member of the Rolling 40's gang, and had seen him many times loitering with other gang members. After arresting Richmond, the officers interviewed him at the station where they observed scrapes on his body described as "road rash." Richmond then admitted that Red Flag had not shot him and that he had been wounded and struck by a car while attempting to rob "a Chinese guy." Richmond denied that a gun had been used in the crime, and when asked whether he committed the crime for himself or for the Rolling 40's gang, he replied, "No, I did it for myself. I'm trying to get some money." Officer Onyshko testified that he did not believe that Richmond was being truthful, because the others involved were also known members of the Rolling 40's gang.

**Gang evidence**

LAPD Officer Andres Sandoval testified as the prosecution's gang expert. In addition to his training and experience as a gang officer, he had the experience of growing up in a neighborhood controlled by Crip gangs, including the Rolling 40's gang.

5

Officer Sandoval reviewed photographs of tattoos on Richmond and Williams, and explained to the jury the gang significance of several of them. Based on information gained from other gang officers, trial testimony, field identification cards and tattoos, Officer Sandoval was of the opinion that Richmond, Williams, and Boswell were all members of the Rolling 40's gang.

Officer Sandoval described the Rolling 40's gang as a very territorial criminal street gang with over 500 members and common symbols, hand signs, and colors. Some members made and posted a rap video on YouTube promoting the gang, bragging about committing robberies, and promising to "put down hard" any victim who failed to cooperate. Officer Sandoval testified that robbery, attempted robbery, and assault with a firearm were among the primary activities of the Rolling 40's gang. Officer Sandoval presented conviction records of two Rolling 40's gang members for attempted murder as evidence of predicate crimes showing the pattern of criminal conduct.

Officer Sandoval explained that gang members were required to "put in work for the gang" by committing crimes such as robbery, assault, and other crimes that benefited the gang and caused fear in others. By putting in work, members could earn respect and elevate their status within the gang. Even a failed robbery attempt could be considered putting in work for the gang when done in association with the gang. Gang members usually committed their crimes in the company of other gang members or talked to other gang members about what work they had done to benefit the gang.

Officer Sandoval's opinions were elicited by use of several hypothetical situations. First, the prosecutor posited that three Rolling 40's gang members in one vehicle without license plates go to a nearby area outside their gang's territory and at least one of them points a gun at a victim. In Officer Sandoval's opinion, such a crime would be committed for the benefit of and in association with the Rolling 40's gang, as shown by their willingness to put in work for the gang outside their neighborhood. He added: "Gang members are now getting smarter. It's not common for them to commit crimes within their neighborhood. They will go outside their city because they don't want to be recognized by witnesses or other friends in the neighborhood. Also, . . . they can come

6

back to the neighborhood and it's common for them to talk about the crimes to show other gang members that . . . they are putting in work for the gang"

In the next hypothetical, the prosecutor added the fact that there is a failed attempt to rob the victim. Officer Sandoval's opinion was that this would be putting in work which was a benefit to the gang and elevated the perpetrator's status as a soldier for the gang. Officer Sandoval agreed on cross-examination that if a gang member who needed money committed robbery alone for the purpose of acquiring money to survive, which he did not share with others, it would be possible that the crime was not committed for the gang's benefit.

**Defense evidence**

A firearms expert testified that the 11 expended bullet casings found at the crime scene all came from one nine-millimeter firearm, which could not have been the fully loaded .38-caliber revolver recovered in the alley. A fingerprint examiner testified that no usable fingerprints were found on the revolver.

Officer Azevedo testified that he read to Liu a standard field show up admonition to the effect that the person detained may or may not be a suspect and being in handcuffs did not prove innocence or guilt, prior to the field show up. Although the identification was video-recorded, the admonition was not on the recording. At the preliminary hearing Officer Azevedo testified that he had no conversation with Liu that was not recorded.

Other witnesses testified regarding the immunity agreement and special visa given to Martinez, an undocumented immigrant, so he could remain in the United States. Martinez's employer testified that he had known Liu for 10 years and occasionally went with him to the bank, but could not accompany him on October 28, 2011. The employer denied he recommend Martinez to Liu.

## DISCUSSION

### I. Involvement of Williams

Williams contends that the evidence was only sufficient to establish that he was a passenger in the getaway car and insufficient for a rational jury to have found that he was a participant in the attempted robbery.

When a criminal conviction is challenged as lacking evidentiary support, "the court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence -- that is, evidence which is reasonable, credible, and of solid value -- such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578; see also *Jackson v. Virginia* (1979) 443 U.S. 307, 318-319.) We must presume in support of the judgment the existence of every fact the jury could reasonably deduce from the evidence. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) "The same standard applies when the conviction rests primarily on circumstantial evidence. [Citation.]" (*Ibid.*) We do not reweigh the evidence or resolve conflicts in the evidence. (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) Reversal on a substantial evidence ground "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

Williams contends that substantial evidence was lacking because the identifications made by Liu and Martinez were weak and difficult to believe. Williams criticizes Martinez's identification as tentative. He also suggests that Liu's identification be rejected on appeal because the one-person field show up was suggestive and Officer Azevedo gave conflicting testimony regarding whether he read to Liu the standard admonition beforehand. Williams also argues that Liu's claim that the suspects approached his car to within six feet was "ludicrous" and contradicted by Martinez's estimate of 45 feet.

"Issues of witness credibility are for the jury. [Citations.]" (*People v. Boyer* (2006) 38 Cal.4th 412, 480, disapproved on another ground in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1.) "Identification of the defendant by a single eyewitness may be sufficient to prove the defendant's identity as the perpetrator of a crime. [Citation.] Moreover, a testifying witness's out-of-court identification is probative for that purpose and can, by itself, be sufficient evidence of the defendant's guilt even if the witness does not confirm it in court. [Citations.]" (*People v. Boyer, supra*, at p. 480.) "'[I]t is not

8

necessary that the identification of the defendant as the perpetrator of the crime be made positively or in a manner free from inconsistencies.   It is the function of the jury to pass upon the strength or the weakness of the identification and the uncertainties of the witnesses in giving their testimony.'  [Citation.]"  (*People v. Primo* (1953) 121 Cal.App.2d 466, 468.)  Any "uncertainties or discrepancies in witnesses' testimony raise only evidentiary issues that are for the jury to resolve.  [Citation.]"  (*People v. Watts* (1999) 76 Cal.App.4th 1250, 1259.)

The jury resolved the conflicts and uncertainties against Williams and the evidence was sufficient.  Liu identified Williams in a field show up as one of the people involved in the assault.  In court Liu identified Williams and Richmond as the two assailants holding guns.  In addition, Martinez testified that he saw either Williams or Richmond holding a gun prior to being struck by the getaway car, although he was uncertain which of the men it was.

Further, whenever an identification is challenged as unfair, reversal is unwarranted unless under the totality circumstances, there appears a substantial likelihood of irreparable misidentification.  (*People v. Cunningham* (2001) 25 Cal.4th 926, 990.)  There was no substantial likelihood of misidentification here:  Richmond, Boswell, and Williams were all members of the same gang and all were expected to put in work for the gang by committing crimes such as robbery; Williams was in the getaway car with Richmond and Boswell during the attempted robbery and when it crashed soon thereafter.  Also at the time of the collision Williams was wearing a black hooded sweatshirt as described by the witnesses and seen in the security video.

Even while acknowledging that we must view the evidence in the light most favorable to the judgment, Williams contends that such evidence showed only that he was an occupant in the perpetrator's car.  He argues that the jury could have found him not guilty based upon the following circumstances:  he did not flee from the site of the getaway car collision; he was not armed when found at the crash site; and he was not wounded.  A substantial evidence review asks whether the circumstances reasonably justify the jury's findings, not whether the circumstances might also be reasonably

reconciled with a contrary finding. (*People v. Earp* (1999) 20 Cal.4th 826, 887-888.) In making that determination, we may not reject logical inferences the jury might have drawn from the circumstantial evidence. (*People v. Maury* (2003) 30 Cal.4th 342, 396.)

Moreover, the jury was not required to find that Williams was a *direct* perpetrator of the attempted robbery, as suggested by his argument. "All persons concerned in the commission of a crime, . . . whether they directly commit the act constituting the offense, or aid and abet in its commission, . . . are principals in any crime so committed." (§ 31.) Instructions were given with regard to aiding and abetting, and in determining whether Williams was concerned in the crime, the jury was not limited to considering his presence in the getaway car or his conduct after the collision with the palm tree. The jury was entitled to consider the evidence concerning his conduct at the scene of the crime, his flight from the scene of the crime, and his companionship with the perpetrators prior to the crime. (See *People v. Medina* (2009) 46 Cal.4th 913, 924.) Circumstances considered by the jury thus included the following: Williams's companions in the car were fellow members of his criminal street gang; members of his gang were expected to put in work by committing crimes such as robbery; he was identified as having been one of the two men who emerged from the car with a gun; he fled the crime scene, whether in the car or on foot; and he was still with his companions after the crime. Considering all these circumstances, we conclude that substantial evidence reasonably supported a finding that Williams was guilty of attempted robbery.

**II.  Constructive possession**

Williams contends that count 2, the attempted robbery of Martinez, must be reversed due to insufficient evidence of the possession element of robbery. In particular, he contends that there was no substantial evidence that Martinez was in constructive possession of the money in Liu's pocket. Richmond joins in the contention without additional argument.

"Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.) The victim's possession is a required element for both a

10

completed robbery or an attempted robbery. (See *People v. Neely* (2009) 176 Cal.App.4th 787, 793-794.) Possession may be actual or constructive, and two or more victims may be found to have joint possession of property. (*People v. Scott* (2009) 45 Cal.4th 743, 749-750 (*Scott*).) Constructive possession may be found where the alleged victim has a "'special relationship' with the owner of the property such that the victim had authority or responsibility to protect the stolen property on behalf of the owner. [Citations.]" (*Id*. at p. 750.) A special relationship is one in which the victim "'has sufficient representative capacity with respect to the owner of the property, so as to have express or implied authority over the property.' [Citation.]" (*Id*. at p. 751.)

Williams argues that the evidence of a special relationship was insufficient because the arrangement between Liu and Martinez was unclear and did not appear to be a contractual relationship in which Martinez was paid to guard Liu's money. He cites the failure of Liu to say that Martinez was "hired" for protection, suggesting that there should have been an express contract or consent to protect or possess the money, or to regain possession of it had the robbery been successful.

We agree with respondent that constructive possession does not require a contractual or employment relationship. For example, a special relationship may include close relatives who live in the same household or visit frequently. (*People v. Weddles* (2010) 184 Cal.App.4th 1365, 1369-1370.) Anyone who has the owner's express or implied authority or responsibility to protect the property may have a special relationship, so long as the protector is more than a Good Samaritan who attempts to thwart the robbery or a mere visitor to a business from which property is taken. (*People v. Nguyen* (2000) 24 Cal.4th 756, 760-761; see *People v. Galoia* (1994) 31 Cal.App.4th 595, 597-599 ["good motives alone" insufficient]; *Sykes v. Superior Court* (1994) 30 Cal.App.4th 479, 481-484 [merely a "neighbor and good citizen seeking to catch a criminal"].)

Williams cites testimony that Liu did not *expressly* ask Martinez to protect him and his money, such as Martinez's response when asked whether he accompanied Liu in order to protect him: "No. I went there to accompany [*sic*] to the bank to do his business." The formation of a special relationship need not be express. (See *Scott,*

11

*supra*, 45 Cal.4th. at p. 751.)  Here, the circumstances suggest that Martinez's authority or responsibility to protect Liu's property was express or at least clearly implied from the circumstances.  Liu testified that he asked Martinez to accompany him and asked him to bring a gun.  Liu also testified that he wanted protection because he had been robbed three weeks earlier after going to the bank alone.  If the arrangement was initially unclear, Liu certainly clarified it when they arrived back at Liu's business with the money.  Liu testified that when he parked, he asked Martinez to get out first and be prepared to fire his weapon if anyone tried to "rob us" of the money in his pocket.  Martinez understood his relationship to Liu and his obligation to protect Liu and the money, as demonstrated by his compliance with the request.  The evidence makes it clear that Martinez was more than a Good Samaritan who tried to stop a random robbery, it is sufficient to establish constructive possession.

## III.  Foundation for expert opinion

Richmond challenges the expert testimony supporting the gang enhancement, imposed under section 186.22, subdivision (b)(1), which authorizes a sentencing enhancement for felonies "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members."  Richmond contends that there was no foundation for the gang expert's opinions that the members of the Rolling 40's gang committed crimes outside their territory because they do not want to be recognized, and that they then return to their territory and talk about the crimes.  In particular, Richmond contends that the expert should have been required to explain the basis of his knowledge by stating whether gang members told him that they returned to their neighborhood and talked about committing crimes elsewhere, and whether gang members had told him about hearing another gang member brag about such crimes.  He suggests that Officer Sandoval's testimony left the impression that a crime committed by a gang member solely for personal gain could benefit the gang, and thus be gang related.

Because an expert may generally base his opinion on any matter known to him, including extrajudicial matters and otherwise inadmissible evidence if reasonably

reliable, disputes over admissibility must generally be left to the trial court's sound discretion. (*People v. Montiel* (1993) 5 Cal.4th 877, 918-919.) However, the trial court was not given the opportunity to exercise discretion here, however, because as respondent notes, Richmond did not object to this testimony in the trial court.

A party must object at trial to the foundation of expert testimony to preserve appellate review of the issue. (*People v. Seaton* (2001) 26 Cal.4th 598, 642-643.) Richmond's failure to make a timely and specific objection on the ground now raised forfeits his challenge. (See *People v. Bolin, supra*, 18 Cal.4th at p. 321 [failure to object to expert's testimony on ground he failed to visit crime scene].) In addition, Richmond did not object to the expert's qualifications. "[W]hile Evidence Code sections 720, subdivision (a), and 802 provide that the person testifying as an expert must be qualified by special knowledge, skill and experience, these foundational requirements need not be established in the absence of a *specific* objection or unless the court, in its discretion, requires it." (*People v. Rodriguez* (1969) 274 Cal.App.2d 770, 776.)

Richmond contends that there can be no forfeiture because Officer Sandoval was "directly given the opportunity" to provide a foundation for his opinion when he was questioned about some confusing preliminary hearing testimony. No such opportunity was communicated directly or indirectly, either to the witness or to the trial court by means of an objection or even an attempt at further cross-examination on the subject.[4] A trial court does not err "in failing to conduct an analysis it was not asked to conduct."

---

[4]     Defense counsel read preliminary hearing proceedings in which Officer Sandoval was asked: "'Let's assume they are gang members. One day I'm a gang member and I decide I need some money, I'm going to go out and rob somebody, I need it for myself and a couple of my friends. That wouldn't be for the benefit of the gang, correct?'" Officer Sandoval replied, "'No, sir.'" Officer Sandoval testified at trial that he possibly misunderstood the question and would need to review the transcripts. Later, in response to a question by the prosecutor, he testified that his answer to the preliminary hearing question was incomplete. He explained: "What I'd like to go back and say, that it's common for them to go back to their neighborhoods and talk about their crimes and that would be one of the ways that it could benefit the gang because it's showing other members that they are putting in work for the gang." Defense counsel were immediately given the opportunity to cross-examine Officer Sandoval, but declined.

13

(*People v. Partida* (2005) 37 Cal.4th 428, 435; see also *People v. Burns* (1987) 196 Cal.App.3d 1440, 1455.)

In any event, although the expert did not testify regarding specific instances of bragging by gang members, he did testify regarding the basis for his knowledge of the cultural habits of members of the Rolling 40's gang. Officer Sandoval described his training and experience as a gang investigating officer, and testified that he had grown up in a neighborhood controlled by Crip gangs, including the Rolling 40's gang. His opinions were based on his training and experience, as well as on information gained from other gang officers, testimony in this trial, field identification cards, and his own acquaintance with Richmond and Williams. We conclude that Officer Sandoval properly relied on this variety of sources in formulating opinions about whether the defendants' conduct was consistent with the culture and habits of a criminal street gang. (See generally, *People v. Gonzalez* (2006) 38 Cal.4th 932, 944-949.)

Richmond contends that if we find that he failed to preserve his foundation challenge with the appropriate objection, he was denied his constitutional right to effective assistance of counsel. As we have found no defect in the foundation for Officer Sandoval's opinions, any objection would most likely have been overruled. Counsel does not render ineffective assistance by failing to make meritless objections. (*People v. Price* (1991) 1 Cal.4th 324, 386-387.)

Further, to prevail on a claim of ineffective assistance of counsel, a defendant must show that "but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland v. Washington* (1984) 466 U.S. 668, 694; see also *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1126.) Richmond has failed to meet this requirement. He contends that Officer Sandoval's testimony left the impression that a crime committed by a gang member solely for personal gain could benefit the gang, and thus supported the finding that the crime was gang related. As we discuss in the next section, however, there was no evidence that Richmond committed the crimes solely for personal gain, and evidence of benefit to the gang was not essential to the gang finding.

14

## IV. Substantial evidence of gang benefit or association

Defendants contend that the gang enhancement must be stricken because it was not supported by substantial evidence that the crime was committed for the benefit of their gang. We reject defendants' premise and conclude that substantial evidence supports the enhancement.

As with a challenge to a criminal conviction, when considering a challenge to the sufficiency of the evidence to support a sentence enhancement, we review the entire record in the light most favorable to the judgment in order to determine whether there is substantial evidence from which the trier of fact can properly base its decision. See part I, *ante*, and *People v. Albillar* (2010) 51 Cal.4th 47, 69-70 (*Albillar*).

We reject defendants' premise that evidence of benefit to the gang was essential to the gang finding. Gang benefit is just one of three alternative bases for establishing the enhancement. (See *People v. Leon* (2008) 161 Cal.App.4th 149, 162 (*Leon*).) There are two prongs to a gang enhancement: (1) the crime was committed for the benefit of, at the direction of, or in association with any criminal street gang; and (2) the crime was committed with the specific intent to promote, further, or assist in any criminal conduct by gang members. (*People v. Villalobos* (2006) 145 Cal.App.4th 310, 322; see *Albillar, supra*, 51 Cal.4th at pp. 59, 67-68; § 186.22, subd. (b).) Defendants' contentions relate to the first prong, which both defendants call the "benefit element." The first prong of the enhancement is worded in the disjunctive: "committed for the benefit of, at the direction of, *or* in association with any criminal street gang." (§186.22, subdivision (b)(1), italics added.) Thus, contrary to the premise of defendants' argument, the first prong of the enhancement is not simply a "benefit element." Indeed, the enhancement may be imposed without evidence of *any* benefit to the gang so long as the crime was committed in association with or at the direction of a criminal street gang. (*Leon, supra*, at p. 162; *People v. Morales* (2003) 112 Cal.App.4th 1176, 1198 (*Morales*).)[5]

---

[5] Relying on *Albillar*, Richmond suggests that the prosecution was required to prove that the crimes were committed both for the benefit of a criminal street gang *and* in association with the gang. His suggestion is apparently based on the conclusion of the

15

Richmond also contends that in order to satisfy the first prong, the benefit, direction, or association must have been for, of, or with the gang as an *entity*, not just for the benefit of, at the direction of, or in association with individual gang members. *Albillar* made it clear however, that the association requirement is satisfied by substantial evidence that the defendants came together as gang members to commit their crimes. (*Albillar, supra*, 51 Cal.4th at pp. 61-62.) The commission of a felony with a known gang member can give rise to a reasonable inference that the crime was committed in association with a gang, unless there is evidence that the defendant was engaged in "'frolic and detour unrelated to the gang.' [Citation.]'" (*Albillar*, at pp. 61-62, quoting *Morales, supra*, 112 Cal.App.4th at p. 1198; see also *Albillar*, at pp. 59-60, 68.)

Here, three gang members came together to commit the very type of crime expected of them by their gang. Officer Sandoval explained that the commission of robberies and armed assaults, as well as production of the YouTube video, were all meant to cause would-be victims and the general public to fear the gang. He was of the opinion that whenever gang members worked together to commit the gang's primary crimes, they were working not only for themselves, but also in association with the gang and for the benefit of the gang by creating such fear. As there was no evidence that defendants' actions amounted to a personal detour or frolic, their commission of the crimes, committed with other gang members, gave rise to a reasonable inference that the crimes were committed in association with their gang. (*Albillar, supra*, 51 Cal.4th at pp. 59-62, 68; *Morales, supra*, 112 Cal.App.4th at p. 1198.) Further, Officer Sandoval's opinion that creating public fear benefited the gang was sufficient to raise the inference that the crimes were committed for the benefit of the gang. (See *Albillar*, at p. 63.)

Williams suggests that the gang expert's testimony could not provide substantial evidence of the first prong because it was merely "generic" and unsupported by evidence

California Supreme Court that substantial evidence supported both findings *in that case*. (See *Albillar, supra*, 51 Cal.4th at pp. 51, 61-62.) The court did not hold that substantial evidence must support a finding of both circumstances.

that any of the defendants identified the Rolling 40's gang with hand signs or by shouting slogans during the crime, that they bragged about putting in work afterward, or that other members of the gang were even aware of the attempted robbery. Some cases decided prior to *Albillar* have leveled similar criticisms of expert testimony. (See, e.g., *People v. Ramon* (2009) 175 Cal.App.4th 843, 851; *In re Frank S.* (2006) 141 Cal.App.4th 1192, 1199.) The California Supreme Court has made it clear, however, that "'[e]xpert opinion that particular criminal conduct benefited a gang' is not only permissible but can be sufficient to support the Penal Code section 186.22, subdivision (b)(1), gang enhancement. [Citation.]" (*People v. Vang* (2011) 52 Cal.4th 1038, 1048 (*Vang*); see also *Albillar, supra*, 51 Cal.4th at p. 63.)

Richmond suggests that Officer Sandoval's testimony should be disregarded altogether because parts of it may be illogical and contradictory. In particular, he finds inconsistency in Officer Sandoval's testimony that gang members committed violent crimes and bragged about it on a YouTube video in order to instill fear in the community, but then gang members commonly commit crimes outside their territory so they will not be recognized. Richmond also cites Officer Sandoval's confusing explanation of preliminary hearing testimony as being an opinion that a gang member who committed a crime for his own benefit would benefit his gang simply by bragging about the crime. Richmond concludes that the expert's testimony did not provide substantial evidence that the subject crimes benefited the gang because it was contradictory, "self-cancelling" and implausible.

"The credibility and weight of the expert testimony was for the jury to determine, and it is not up to us to reevaluate it. [Citations.]" (*People v. Flores* (2006) 144 Cal.App.4th 625, 633.) Regardless, if we disregard the expert's opinions concerning benefit to the gang, it remains that overwhelming evidence established that all three perpetrators were Rolling 40's gang members, and as there was no evidence that defendants were engaged in a personal detour or frolic, substantial evidence supports a reasonable inference that the crime was committed in association with the gang. (See

17

*Albillar, supra*, 51 Cal.4th at pp. 59-62, 68; see also *Morales, supra*, 112 Cal.App.4th at p. 1198.)

Williams also contends that the defendants' gang membership could have been merely incidental to the commission of the offense, and that this is demonstrated by the reasoning of *People v. Rios* (2013) 222 Cal.App.4th 542 (*Rios*). There, under very different facts, it was held that the second prong of the gang enhancement ("specific intent to promote, further, or assist in any criminal conduct by gang members") was unsupported by substantial evidence. In *Rios*, the evidence was insufficient because the defendant acted alone and the only hypothetical facts considered by the gang expert in giving his opinion, were that the perpetrator was a gang member and he possessed a gun. (*Id.* at pp. 573-574.) Williams does not challenge the specific intent prong, but argues that *Rios* is applicable here because, "as a practical matter," the crime required the participation of more than one person. We disagree and find nothing in *Rios* that supports Williams's contention that the evidence in *this case* was insufficient to support the gang enhancement. Further, as defendants' argument that common gang membership might have been merely incidental to the commission of the crimes is unsupported by any evidence of a personal detour or frolic, his commission of the crimes with other gang members gave rise to a reasonable inference that the crimes were committed in association with their gang. (*Albillar, supra*, 51 Cal.4th at pp. 59-62, 68; *Morales, supra*, 112 Cal.App.4th at p. 1198.)

## V. Richmond's truthfulness

Richmond contends that the trial court committed prejudicial error in admitting the improper opinions of Officers Onyshko and Sandoval to the effect that Richmond lied. This contention lacks merit.

A trial court may exclude as speculative the opinion about another witness's veracity offered by a witness with no personal knowledge of the events. (*People v. Riggs* (2008) 44 Cal.4th 248, 300; see *People v. Melton* (1988) 44 Cal.3d 713, 744.) All rulings on the admissibility of evidence are reviewed under the abuse of discretion standard. (*People v. Rowland* (1992) 4 Cal.4th 238, 264.) A trial court's "discretion must not be

disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]" (*People v. Jordan* (1986) 42 Cal.3d 308, 316.)

In his interview with Richmond, Officer Onyshko asked whether he had committed the robbery for himself or for the Rolling 40's gang. Richmond replied that he did it for himself. At trial, the prosecutor asked the officer: "Did you believe based upon your knowledge of Mr. Richmond and your knowledge of the [Rolling 40's gang] that he was being truthful with you regarding that answer to that question?" Officer Onyshko explained that he asked the question because he already knew that the two other suspects were gang members and that Richmond had lied when he said there had been no gun involved. Officer Onyshko was acquainted with Richmond, knew him to be a member of the Rolling 40's gang, and had often seen him in the company of other gang members. As Officer Onyshko had some additional knowledge of the circumstances, admitting the testimony was neither arbitrary nor capricious.

Nor has Richmond demonstrated a miscarriage of justice. The trial court gave thorough instructions to the jury regarding the evaluation of evidence, including the following: they were the sole judges of the credibility of witnesses; they should give the testimony of each witness whatever weight they think it deserved; they were the sole judges of whether defendant made an admission and whether his statement was true in whole or in part; and they were not bound by the expert's opinions, but should give them the weight they deserved and disregard any opinion they found to be unreasonable. We presume the jury followed these instructions. (See *People v. Homick* (2012) 55 Cal.4th 816, 879. ) Where, as here, the jury is given such instructions and the evidence of guilt is strong, an investigating officer's "unsurprising opinions" regarding defendant's guilt is unlikely to affect the verdict. (*People v. Riggs, supra*, 44 Cal.4th at pp. 300-301.)

Richmond also contends that the trial court erred in allowing the gang expert's testimony in which he agreed with the prosecutor that if Richmond "hypothetically said it was for himself, isn't it true that it could have been to just further promote himself within the gang?" The question did not necessarily call for an opinion regarding Richmond's

19

truthfulness so much as an opinion regarding dual benefit. When Officer Sandoval agreed with the question, he had already testified that a crime committed for the gang member's own benefit could also be for the benefit of or in association with his gang. He explained that gang members were required to "put in work for the gang," and that they earned respect and status within the gang by committing crimes that benefitted the gang by causing fear in the community.

Richmond argues that the question was nevertheless an improper hypothetical because it was not truly hypothetical and called for an opinion about Richmond's personal motive. Richmond objected to the question as irrelevant; he did not object to the form of the hypothetical, nor did he object on the ground that it called for an improper opinion. He thus failed to preserve the issue for review. (See *People v. Fierro* (1991) 1 Cal.4th 173, 209 [hypothetical to jury panel]; *People v. Gutierrez* (1992) 10 Cal.App.4th 1729, 1734-1735 [hypothetical to expert]; Evid. Code, § 353.)

Regardless, Richmond has not shown that the admission of the challenged opinion was arbitrary or capricious. A hypothetical question that closely mirrors the evidence may be proper even when it is obvious that it concerns the subject matter of the trial and the defendant. (*Vang, supra*, 52 Cal.4th at pp. 1047-1048.) It is ordinarily improper to elicit expert testimony regarding whether the specific defendant acted for a gang reason, because such an opinion is of no assistance to the jury; however, an expert opinion is not invariably objectionable simply because it obviously refers to the defendant. (See *People v. Valdez* (1997) 58 Cal.App.4th 494, 507 [opinion that defendant's activities were undertaken on behalf of his gang], cited with approval in *Vang,* at p. 1048, fn. 4; *People v. Prince* (2007) 40 Cal.4th 1179, 1227.)

Moreover, Richmond has not demonstrated that the form of the hypothetical or Officer Sandoval's opinion resulted in a miscarriage of justice. Officer Sandoval was not asked to give his opinion regarding Richmond's personal motive; nor was he asked to opine about whether Richmond lied, or indeed about anything Richmond was thinking, and he did not do so. Although the question was not fully hypothetical, any modified question would not have been materially different; a fully hypothetical question would

20

likely have elicited the nearly identical and unremarkable opinion that a hypothetical gang member who claimed to have committed the crime for himself could have committed the crime for the gang. As Officer Sandoval had already explained that possibility when testifying in general about gang culture, it is not reasonably likely that omitting any reference to Richmond would have changed the result.

In the final analysis, neither Officer Sandoval's opinion nor Officer Onyshko's opinion appears to have had much significance at trial. In summation, the prosecutor did not allude to either opinion or to Richmond's claim to have acted for himself, and the jury demonstrated its independent ability to evaluate the witnesses' opinions by finding the firearm allegations not true despite the officer's opinion that Richmond had lied about having a gun. As we discern no reasonable probability that Richmond would have achieved a better result without the challenged opinions, any error in admitting them was harmless. (See *People v. Riggs, supra*, 44 Cal.4th at p. 301.)

## DISPOSITION

The judgments are affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
                                        CHAVEZ


We concur:



_____, Acting P. J.
ASHMANN-GERST




_____, J.
HOFFSTADT